**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| STC.UNM,<br><br>Plaintiff,<br><br>vs.<br><br>APPLE INC.,<br><br>Defendant. | NO. 6:19–CV–428<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO TRANSFER VENUE**

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 1

III. ARGUMENT ..... 5

A. The Private Interest Factors Weigh Strongly Against Transfer. ..... 6

1. The Relative Ease of Access to Sources of Proof. ..... 6

2. The Availability of Compulsory Process. ..... 11

3. The Convenience to Willing Witnesses. ..... 12

4. Practical Issues ..... 14

B. The Public Interest Factors Weigh Strongly Against Transfer. ..... 14

C. Apple Has Not Clearly Demonstrated that Transfer to Austin is Warranted. ..... 15

IV. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

## CASES:

*Action Indus., Inc. v. U.S. Fid. & Guar. Co.*,
358 F.3d 337 (5th Cir. 2004) ........ 5

*ADS Sec. L.P. v. Advanced Detection Sec. Servs., Inc.*, No. A-09-CA-773-LY,
2010 WL 1170976 (W.D. Tex. Mar. 23, 2010) ........ 12

*Ames v. Kansas*,
111 U.S. 449 (1884) ........ 1

*Bd. of Regents of the Univ. of Tex. Sys. v. Bos. Sci. Corp*,
936 F.3d 1365 (Fed. Cir. 2019) ........ 1

*Carruth v. Michot*,
No. 15-CA-00189, 2015 WL 6506550 (W.D. Tex. Oct. 26, 2015) ........ 11

*Core Wireless Licensing, S.A.R.L v. Apple, Inc.*, 6:14-CV-751 JRG-JDL,
2015 WL 11143431 (E.D. Tex. Aug. 31, 2015) ........ 8

*East Texas Boot Co., LLC v. Nike, Inc.*, No. 2:16-cv-0290-JRG-RSP,
2017 WL 2859065 (E.D. Tex. Feb. 15, 2017) ........ 11, 14

*Fintiv, Inc. v. Apple Inc.*, 6:18-CV-00372-ADA,
2019 WL 4743678 (W.D. Tex. Sept. 13, 2019) ........ 7, 8, 11, 14

*Freehold Licensing, Inc. v. Aequitatem Capital Partners, LLC*,
No. A-18-CV-413-LY, 2018 WL 5539929 (W.D. Tex. Oct. 29, 2018) ........ 13

*FreshHub, Inc. v. Amazon.com Inc.*,
No. 1:19-CV-00885-ADA (W.D. Tex. Sept. 9, 2019) ........ 6

*In re Genentech, Inc.*,
566 F.3d 1338 (Fed. Cir. 2009) ........ 14, 15

*In re Hoffman-LaRoche Inc.*,
587 F.3d 1333 (Fed. Cir. 2009) ........ 11

*In re Radmax*,
720 F.3d 285 (5th Cir. 2013) ........ 6

*In re Volkswagen AG*,
371 F.3d 201 (5th Cir. 2004) ........ 5

*In re Volkswagen of Am., Inc.*,
545 F.3d 304 (5th Cir. 2008) ........ 5, 6, 11

*Kilbourne v. Apple Inc.*, CV H-17-3283,
2018 WL 3954864 (S.D. Tex. July 27, 2018) ........ 8

*MEC Res., LLC v. Apple, Inc.*,
269 F. Supp. 3d 218 (D. Del. 2017) ........ 8

*ParkerVision, Inc. v. Apple Inc.*, 3:15-CV-1477-J-39JRK,
2018 WL 5084731 (M.D. Fla. Jan. 9, 2018) ........ 8

*QR Spex, Inc. v. Motorola, Inc.*,
507 F.Supp.2d 650 (E.D. Tex. 2007) ........ 5

*Regents of University of University of New Mexico v. Knight*,
321 F.3d 1111 (Fed. Cir. 2003) ........ 1

*Rittinger v. Healthy Alliance Life Ins. Co.*,
No. 4:16-CV-00639, 2016 WL 5404769 (S.D. Tex. July 27, 2016) ........ 10

*STC.UNM v. Quest Diagnostics Inc.*, CIV 17-1123 MV/KBM,
2019 WL 1091390 (D.N.M. Mar. 8, 2019) ........ 1

*STC.UNM v. TP-Link Techs. Co..*,
No. 6:19cv262 (W.D. Tex. 2019) ........ 14

*Stewart Org., Inc. v. Ricoh Corp.*,
487 U.S. 22 (1988) ........ 5

*Tex. Data Co., L.L.C. v. Target Brands, Inc.*,
771 F.Supp.2d 630 (E.D. Tex. 2011) ........ 15

*Uniloc USA Inc. v. Samsung Elecs. Am.*,
No. 2:16-cv-00642-JRG, ECF No. 216 at 8-9 (E.D. Tex. Apr. 19, 2017) ........ 7

*UUSI, LLC v. Apple Inc.*,
17-13798, 2018 WL 3768794 (E.D. Mich. July 31, 2018) ........ 8

*Van Dusen v. Barrack*,
376 U.S. 612 (1964) ........ 5

*Weatherford Tech. Holdings, LLC v. Tesco Corp.*,
No. 2:17-CV-00456-JRG, 2018 WL 4620636 (E.D. Tex. May 22, 2018) ........ 6

**STATUTES:**

Title 28 U.S.C. § 1404(a) ........ 5

## I. INTRODUCTION

Plaintiff STC.UNM, the University of New Mexico ("UNM"), and the Board of Regents of UNM are arms of the State of New Mexico. *See Regents of University of University of New Mexico v. Knight*, 321 F.3d 1111 (Fed. Cir. 2003); *STC.UNM v. Quest Diagnostics Inc.*, CIV 17-1123 MV/KBM, 2019 WL 1091390, at *1 (D.N.M. Mar. 8, 2019). Absent express consent, the only court with exclusive original jurisdiction over an arm of a state is the United States Supreme Court; however, a state is allowed "to sue for itself in ***any*** tribunal that could entertain its case." *Ames v. Kansas*, 111 U.S. 449, 465 (1884). Thus, when an arm of a state brings an action, it is entitled to choose to litigate within any forum having requisite jurisdiction, and it cannot be forced to proceed in a forum of the defendant's choice based on a venue statute. By filing this lawsuit, STC.UNM consented to litigate only in this Court, and it specifically objects to the jurisdiction of the Northern District of California ("NDCAL"). The arguments herein are made subject to this objection and without waiver of STC.UNM's sovereign right to litigate in the forum of its choosing.[1]

Subject to and aside from the foregoing, Defendant Apple Inc. ("Apple") has failed to carry its heavy burden of proving that the NDCAL is a clearly more convenient venue for this dispute.

## II. FACTUAL BACKGROUND

**STC.UNM and the Patents-In-Suit.** STC.UNM is a New Mexico nonprofit research park corporation formed, owned, and controlled entirely by the Board of Regents of UNM. Dkt. 1, ¶ 1. STC.UNM's mission includes nurturing inventions researched and developed at UNM and promoting technological collaboration between UNM and other universities and research institutes

[1] The Federal Circuit recently held that a state's filing of a patent infringement suit operates as a nationwide constructive waiver of jurisdiction. *See Bd. of Regents of the Univ. of Tex. Sys. v. Bos. Sci. Corp*, 936 F.3d 1365, 1374 (Fed. Cir. 2019). The University of Texas is planning an appeal of that decision to the United States Supreme Court. In any event, the Court should, at a minimum, afford heightened deference to a sovereign plaintiff's choice of venue when analyzing the factors for a transfer based on a defendant's purported inconvenience.

in the U.S. and abroad. *Id.*, ¶ 4. STC.UNM furthers its mission by licensing and, if necessary, enforcing its inventions and reinvesting proceeds into continued research and development at UNM. *Id.*, ¶ 5. In this lawsuit, STC.UNM alleges infringement of three patents (the "Patents-in-Suit"), which were originally owned by the Industrial Technology Research Institute ("ITRI"), a world-leading Taiwanese government-funded research and development center. Ex. 1.[2]

The Patents-in-Suit describe and disclose methods that make high speed MIMO (multiple input, multiple output) wireless communication possible, and their teachings are required by the adopted Wi-Fi standard known as IEEE 802.11ac. Dkt. 1, ¶ 45, Exs. A-C. In this case, STC.UNM contends that certain claims of the Patents-in-Suit ***read on the 802.11ac Wi-Fi standard***. Thus, STC.UNM's Preliminary Infringement Contentions do not rely on reverse engineering of any Apple accused devices (the "Accused Products"), nor do they analyze the chips that are integrated into the Accused Products that enable wireless functionality. Ex. 2. As STC.UNM's contentions show, if ***any*** device practices the 802.11ac standard, it infringes the asserted claims. *Id.* To prove infringement, STC.UNM merely needs to prove (1) the Patents-in-Suit cover the 802.11ac standard and (2) the Accused Products practice the 802.11ac standard. Apple indisputably admits to the Federal Communications Commission, the purchasers of the Accused Products, and the wireless carriers who sell the Accused Products that they are all compliant with and practice the 802.11ac standard.

Thus, although the infringing standard has been adopted by Apple in every Accused Product, it is not technology that was developed by either Apple or its wireless chip supplier, Broadcom. It is a wireless telecommunications standard that was issued by the IEEE Standards Association, which is based in Piscataway, New Jersey. Ex. 3. Although the IEEE developed and published the 802.11ac standard, it does not ensure and promote compliance with the standard. Rather, those tasks are

---

[2] Unless otherwise indicated, all numbered exhibits are attached to the Declaration of William D. Ellerman, filed herewith.

carried out by an entity called the Wi-Fi Alliance, which is comprised of a "worldwide network of companies" that "drives global Wi-Fi adoption and evolution" through, among other things, "[l]eading, developing, and embracing industry-agreed standards." Ex. 4. The Wi-Fi Alliance conducts rigorous testing and certification of Wi-Fi enabled products in order to ensure compliance with "industry-agreed standards for interoperability, security, and a range of application specific protocols." Ex. 5. The Wi-Fi Alliance maintains extensive testing protocols for its member companies in order to ensure their devices comply with all Wi-Fi standards, including the 802.11ac standard at issue in this case. Ex. 6.

Out of the many hundreds of global companies that are members of the Wi-Fi Alliance, only 14 members are ranked as "Sponsor Members." Two of those Sponsor Members are Apple and Broadcom. Ex. 7. The Wi-Fi Alliance's worldwide headquarters are located at 10900-B Stonelake Boulevard, Suite 126, in ***Austin, Texas.*** Ex. 8.

**Apple and the Accused Products.** Although Apple's headquarters are in Cupertino, California, its second largest corporate office is within this District. Specifically, Apple employs approximately 7,000 people in Austin, Texas (the "Austin Campus"). Ex. 9. Apple is currently building an additional $1 billion facility in Austin, which will be located less than a mile from the current Austin Campus, will occupy 113 acres, will initially accommodate 5,000 additional employees, will have the capacity to grow to 15,000 employees, and will make Apple the largest private employer in this District. *Id.* Taxpayers in this District have already paid at least $36 million for the existing Austin Campus, and they will pay up to $33 million in connection with Apple's current development. Ex. 10. Although Apple's motion almost completely ignores the existence of the Austin Campus and only gives it passing mention as if it were some remote outpost with no connection to the real work that goes on in Cupertino, that is clearly not the case. Though Apple infers that its employees with knowledge of "marketing, licensing and sales of the Accused Products work in or near Santa Clara

Valley,"[3] its own published materials demonstrate that jobs at the Austin Campus include "engineering, R&D, operations, finance, and sales," which are some of the very functions that Apple claims exist only in Cupertino. Ex. 11. And according to a 2016 New York Times article, at the Austin Campus, "about 500 engineers work on the chips" that are incorporated into Apple's products. Ex. 12. More revealing, only two days before Apple filed its motion to transfer, it posted a job listing on its website for a "Senior Wifi Network Engineer" to work at the ***Austin Campus***, and the listing described an "essential" job qualification to be "[s]trong knowledge of ***IEEE 802.11n/ac***/ax." Ex. 13 (emphasis added). Apple identifies no NDCAL employees with this type of job description, and such an engineer (and any members of the current team he or she will be joining at the Austin Campus) would have vastly more relevant knowledge than the generic employees Apple proffers.

The Accused Products include multiple generations of iPhones, iPads, Mac laptop and desktop computers, and the Apple TV, all of which are compliant with the 802.11ac standard. Dkt. 1, ¶ 44; Ex. 2. According to Apple's motion, the wireless 802.11ac functionality in those products is enabled by chips supplied by Broadcom. But according to Apple's published supplier list, none of the Broadcom products used by Apple originate from California; rather, they are supplied from Colorado, Pennsylvania, and Taiwan.[4] Ex. 14. And most or all of Apple's manufacturing of the Accused Products occurs in China—save for one notable exception. The Mac Pro, which is Apple's flagship desktop computer and an Accused Product in this case, is made in ***Austin, Texas*** by a contract manufacturer called Flex Ltd. that added around 2,000 employees for the sole purpose of making that Accused Product. Ex. 12. And Apple recently announced that it will continue making

[3] Apple's sole declarant barely even acknowledges that "Apple has [a] non-retail office[] in Austin," but he is nevertheless careful to disclaim that "to the best of [his] knowledge," the only employees with knowledge about the Accused Products are in the NDCAL. Dkt. 22-2, ¶ 15.

[4] Apple's list of its top 200 suppliers also includes a number of other suppliers located in this District.

the latest generation of the Mac Pro in Austin—In the words of its CEO Tim Cook, "[t]he Mac Pro is Apple's most powerful computer ever and we're proud to be building it in Austin." Ex. 15.

Although Apple is a Sponsor Member of the Wi-Fi Alliance in Austin, it does not publish whether it puts its products through the Alliance's certification process. However, Broadcom (whose chips Apple contends enable 802.11ac compliance in the Accused Products) ***does*** obtain Wi-Fi Alliance certification for its chips that are integrated into the Accused Products. For example, the accused iPhone 8 Plus contains a Broadcom BCM4361 wireless chip, (Ex. 16) and the Wi-Fi Alliance specifically names that chip as being 802.11ac certified. Ex. 17. Similarly, the flagship Mac Pro, which is made in Austin, contains a Broadcom BCM4360 5G WiFi chip, (Ex. 18) which the Wi-Fi Alliance has also certified as being 802.11ac compliant. Ex. 19.

## III. ARGUMENT

Title 28 U.S.C. § 1404(a) gives the Court considerable discretion to determine motions for transfer according to "an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The party moving for a transfer carries the burden of demonstrating good cause to justify it. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314 (5th Cir. 2008) ("*Volkswagen II*"). To carry its burden of showing good cause, "a moving party . . . [must] ***clearly*** demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'" *Id.* (emphasis added). This burden is a "heavy" one. *QR Spex, Inc. v. Motorola, Inc.*, 507 F.Supp.2d 650, 664 (E.D. Tex. 2007).

In the Fifth Circuit, the transfer analysis turns on "a number of public and private interest factors, none of which can be said to be of dispositive weight."[5] *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004). Although a plaintiff's choice of venue is not a separate

[5] The private and public interest factors listed below are described in *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004).

factor in the transfer analysis, "when the transferee venue is not ***clearly*** more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Volkswagen II*, 545 F.3d at 315 (emphasis added). That should particularly hold true where, as here, the plaintiff is the sovereign arm of a state that has not consented to jurisdiction in the proposed transferee forum. When analyzing the convenience factors, a court may "consider undisputed facts outside the pleadings, but it must draw all reasonable inferences and resolve all factual conflicts in favor of the non-moving party." *Weatherford Tech. Holdings, LLC v. Tesco Corp.*, No. 2:17-CV-00456-JRG, 2018 WL 4620636, at *2 (E.D. Tex. May 22, 2018).

### A. THE PRIVATE INTEREST FACTORS WEIGH STRONGLY AGAINST TRANSFER.

#### 1. The Relative Ease of Access to Sources of Proof.

In considering the relative ease of access to proof, courts traditionally look to where documentary evidence, such as copies of documents and physical evidence, are located. *Volkswagen II*, 545 F.3d at 316. But as the Fifth Circuit has explained, "the question is *relative* ease of access, not *absolute* ease of access." *In re Radmax*, 720 F.3d 285 (5th Cir. 2013) (citing *Volkswagen II*, 545 F.3d at 316). "As a general practice, this Court gives little weight to the location of the documents given the ease with which documents may be produced. . ." *FreshHub, Inc. v. Amazon.com Inc.*, No. 1:19-CV-00885-ADA (W.D. Tex. Sept. 9, 2019), ECF No. 29. Here, the location of relevant evidence, from Apple and critical third parties, weighs heavily in favor of this District.

**Apple's Sources of Proof.** Apple first contends that unspecified documents regarding "marketing, sales and financial information for the Accused Products" are located somewhere "in or around" Cupertino, California. But aside from the fact that Apple does not explain what these documents are or how they are relevant, it has not made any effort to distinguish between electronically stored documents and any hard copy documents, nor has Apple demonstrated how it is "relatively" easier to access these documents at its Northern California headquarters than at its

vast Austin Campus.[6] Apple has presented no evidence that its servers are not equally as accessible in Austin as they would be in Cupertino, nor has it identified any relevant electronically stored information for which access is specifically restricted to Cupertino employees. As this Court has recognized, "in modern patent litigation, all (or nearly all) produced documents exist as electronic documents on a party's server," and thus "there is no difference in the relative ease of access to sources of proof from the transferor district as compared to the transferee district." *Fintiv, Inc. v. Apple Inc.*, 6:18-CV-00372-ADA, 2019 WL 4743678, at *4 (W.D. Tex. Sept. 13, 2019).[7] Apple provides no explanation as to why it would be difficult, burdensome, or make any difference whatsoever if its documents were produced from either Cupertino or Austin.[8]

Next, Apple contends that its three cherry-picked employees (who are unsurprisingly located in Northern California) mitigate in favor of a transfer. But Apple's unilateral selection of these witnesses should be given no weight. The only one of those witnesses who has provided a declaration is Michael Jaynes, who is a "Senior Finance Manager" at Apple and claims to have broad and unspecified knowledge of "Apple's sales and financial information." Mr. Jaynes' actual role, however, is that of a litigation support professional—his job at Apple is to "provide[] and present[] financial data and analysis in support of the ***global Litigation***, Licensing, and Trademark teams." Ex. 21. Apple can hardly rest its claim of inconvenience on the shoulders of Mr. Jaynes as its sole declarant, when it is literally ***his job*** to travel the world to support Apple in litigation.[9] Apple has

[6] The only broad category Apple describes that could have any relevance here are "sales and financial information." Certainly, Apple does not keep boxes of hard copy financial documents in a warehouse "in or around" Cupertino—these are electronic documents that can easily be produced at the Austin Campus or anywhere else in the world.

[7] *See also Uniloc USA Inc. v. Samsung Elecs. Am.*, No. 2:16-cv-00642-JRG, ECF No. 216 at 8-9 (E.D. Tex. Apr. 19, 2017) ("the Court finds it odd to ignore this reality in favor of a fictional analysis that has more to do with early Xerox machines than modern server forms.").

[8] Apple sent STC.UNM the proposed terms of a protective order in this case, which proposed that Apple's most sensitive information would be produced on a computer at the office of its outside counsel, thus belying any implication that the physical location of documents matters at all. Ex. 20.

[9] Mr. Jaynes has signed at least ***six*** similar declarations in support of Apple's efforts to transfer

presented no evidence that Mr. Jaynes is the only financial employee at Apple who has access to its sales data, or that there are no such equally capable employees at the Austin Campus.

Neither of the other two Apple employees identified by Mr. Jaynes are adequately described or even marginally relevant:

- Mr. Jaynes claims Vivek Bhardwaj has knowledge of Apple's marketing of Wi-Fi technology. But STC.UNM can find no instances where Apple has specifically marketed Wi-Fi technology, save for representing that the Accused Products are 802.11ac compliant in their product specifications.[10]

- Mr. Jaynes claims that Jeff Lasker has relevant knowledge, but Mr. Lasker is an Apple in-house attorney whose sole involvement was participating in inadmissible, confidential pre-suit settlement negotiations with STC.UNM.[11]

Despite Mr. Jaynes' careful disclaimer that "to the best of [his] knowledge" the only Apple employees with relevant information are located in the NDCAL, that is not the case.[12] Apple employs at least 500 engineers who work at its Austin Campus. Ex. 12. And it has very recently posted a job advertisement for a "Senior Wifi Network Engineer" for its Austin Campus who must have "strong knowledge" of the 802.11ac standard. Ex. 13. STC.UNM absolutely wants to depose

---

venue to Northern California in other cases. *See Fintiv, Inc. v. Apple Inc.*, 6:18-CV-00372-ADA, 2019 WL 4743678 (W.D. Tex. Sept. 13, 2019) (Dkt. 40, Ex. A); *UUSI, LLC v. Apple Inc.*, 17-13798, 2018 WL 3768794 (E.D. Mich. July 31, 2018) (Dkt. 38, Ex. 2); *Kilbourne v. Apple Inc.*, CV H-17-3283, 2018 WL 3954864 (S.D. Tex. July 27, 2018) (Dkt. 29, Ex. 1); *ParkerVision, Inc. v. Apple Inc.*, 3:15-CV-1477-J-39JRK, 2018 WL 5084731 (M.D. Fla. Jan. 9, 2018) (Dkt. 58, Ex. A); *MEC Res., LLC v. Apple, Inc.*, 269 F. Supp. 3d 218 (D. Del. 2017) (Dkt. 57); *Core Wireless Licensing, S.A.R.L v. Apple, Inc.*, 6:14-CV-751 JRG-JDL, 2015 WL 11143431 (E.D. Tex. Aug. 31, 2015) (Dkt. 65, Ex. 4).

[10] *See* Exs. 22-25 (product specifications from Apple's website for representative samples of Accused Products including an iPhone, an iPad, a MacBook Pro, and an iMac Pro, which indicate 802.11ac compliance).

[11] The only conceivably relevant information Mr. Lasker could possess would be knowledge of the dates upon which Apple was notified of its infringement of the Patents-in-Suit, but Apple has already entered into a binding stipulation as to those notice dates. Dkt. 25.

[12] As this Court has noted, there is an "information asymmetry between the parties at this stage of the case, which unfairly handicaps the patentee/non-movant as it can only find potential witnesses using public information whereas the alleged infringer/movant has both public and confidential information." *Fintiv*, 2019 WL 4743678, at *4. But here, even basic publicly available information exposes Apple's transparent attempt to cherry-pick NDCAL witnesses, while completely ignoring sources of proof within this District.

whoever fills that position (and others with similar job descriptions), as well as any other engineers who work on the Wi-Fi team at the Austin Campus. Tellingly, Apple has not identified ***any*** such "Senior Wifi Network Engineers" located in Cupertino or anywhere else in the NDCAL, which means the only evidence of any such employees at Apple points to their presence in ***this District***.

**Third Party Sources of Proof.** Apple's emphasis on Broadcom's importance to this case is vastly overstated. STC.UNM contends that the claims of the patents-in-suit read on the 802.11ac ***standard*** and any devices ***practicing that standard***. Thus, the manufacturer of the particular wireless chips that enable 802.11ac compliance in the Accused Products is not what is important—what is important is that the Apple's devices practice the standard. That evidence is obtained easily enough from product specifications listed on Apple's website. *See* Exs. 22-25.

In any event, there is no evidence of any relevant Broadcom documents in the NDCAL. Both Apple and Broadcom's declarant are careful to state that Broadcom's documents were "***generated***" somewhere in the ***State of California***, but this says absolutely nothing about where those documents are stored today. And regardless of where they are stored, Broadcom has an Austin office through which it could easily produce them. Ex. 26. Moreover, Apple's assertion that Broadcom's wireless chips originate from the NDCAL is questionable at best—Broadcom delivers components to Apple from three addresses, ***none*** of which are in the NDCAL (Ex. 14), and Broadcom's declarant states that all "design work" for its chips occurs in four places, only ***one*** of which is in the NDCAL.[13] And again, the design of the chips is not relevant. What is relevant is that they are 802.11ac compliant—which is an admitted fact.

Apple's evidence regarding Broadcom's proffered witnesses is equally disconnected from the NDCAL. Apple submits the declaration of Rohit Gaikwad, who is a Vice-President of R&D at

---

[13] Broadcom states that all "design work" occurs in San Diego, Irvine, San Jose, and India, and that all manufacturing occurs in Asia. San Jose is the only one of these locations that is in the NDCAL.

Broadcom, but Mr. Gaikwad works in San Diego, which is nearly 500 miles away from the NDCAL. Ex. 27. And although Mr. Gaikwad identifies two employees of Broadcom who office in the NDCAL, he simply states that he "work[s] closely" with them, but offers no summaries of what relevant evidence, if any, they could possibly have. *See Rittinger v. Healthy Alliance Life Ins. Co.*, No. 4:16-CV-00639, 2016 WL 5404769, at *7 (S.D. Tex. July 27, 2016) (stating that "the movant must specifically identify the key witnesses and outline their testimony."). Because STC.UNM's current infringement theories do not depend upon Broadcom's chip design, but rather upon whether Apple's devices operate on the 802.11ac standard, if any information from Broadcom is necessary at all, it can be easily obtained through third-party discovery.

Toward that end, a far more critical source of third-party evidence is present right here in this District. The Wi-Fi Alliance promotes, certifies, and ensures uniform adoption of all Wi-Fi standards, including 802.11ac. Both Apple and Broadcom are Sponsor Members of the Wi-Fi Alliance, and the Broadcom chips that Apple contends enable wireless functionality in the Accused Products are certified as 802.11ac compliant by that organization in Austin. STC.UNM will seek documents and corporate representative testimony from this entity, and there is likely no other source anywhere in the United States that can provide the same wealth of knowledge (and proof of infringement) as the Wi-Fi Alliance. That source of proof is located ***within this District***.

Finally, to the extent STC.UNM requires discovery regarding Apple's manufacturing of the Accused Products, that evidence is also in this District. Apple does not engage in any manufacturing whatsoever in the NDCAL. But one of the Accused Products, the Mac Pro, is manufactured by 2,000 workers at Flex Ltd. ***in Austin***, and it contains a Broadcom wireless chip that is certified as 802.11ac compliant by the Wi-Fi Alliance ***in Austin***.[14]

[14] It is certainly easier to obtain discovery from Apple's contract manufacturer in Austin than it would be to seek discovery from Apple's Chinese manufacturing partners, which would likely prove impossible.

**2. The Availability of Compulsory Process.**

The "availability of compulsory process" factor focuses on unwilling, non-party witnesses, not those who are willing to appear and testify. *See Volkswagen II*, 545 F.3d at 316; *Carruth v. Michot*, No. 15-CA-00189, 2015 WL 6506550, at *9 (W.D. Tex. Oct. 26, 2015). Thus, the factor considers the availability of subpoena power to secure the attendance of witnesses (particularly non-party witnesses) whose attendance may need to be obtained by court order. *Fintiv*, 2019 WL 4743678, at *5. The Federal Circuit has recognized that "absolute subpoena power" is the subpoena power for both depositions and trial. *In re Hoffman-LaRoche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009).

Here, there are no unwilling non-party witnesses in the NDCAL. Apple identifies Broadcom employees, some of which are in the NDCAL, as third-party witnesses, but they are far from "unwilling." By allowing one of its engineers (who is ***not*** located in the NDCAL himself) to sign a declaration on Apple's behalf, Broadcom has shown it is perfectly willing to get involved in this case. Obviously, given their close business and financial relationship, Broadcom is not a third-party that Apple will ever be forced to subpoena to testify in its favor. *See East Texas Boot Co., LLC v. Nike, Inc.*, No. 2:16-cv-0290-JRG-RSP, 2017 WL 2859065 at *4 (E.D. Tex. Feb. 15, 2017) (concluding it was unlikely that former Nike employee would be an unwilling witness). If STC.UNM requires any evidence from Broadcom at all, it can obtain whatever evidence it needs via a third-party subpoena.[15]

On the other hand, compulsory process will be necessary to secure the testimony of important witnesses in this District. Both Apple and Broadcom are two of the biggest Sponsor Members of the Wi-Fi Alliance, so that organization is unlikely to voluntarily cooperate with STC.UNM.[16] Thus, this

[15] Apple also mentions in passing that one of the attorneys involved in prosecuting the Patents-in-Suit is located in the NDCAL. However, Apple has not stated why, if at all, that attorney would be a witness in this case, and it is highly unlikely that he ever would be a witness.

[16] The Wi-Fi Alliance's cooperation is even more unlikely due to the fact that by certifying products as 802.11ac compliant, the Wi-Fi Alliance is confirming that those products infringe the Patents-in-Suit under STC.UNM's theories.

Court's compulsory process will be required to seek documents and corporate representative testimony regarding a number of topics from the Wi-Fi Alliance, including: (1) facts surrounding the 802.11ac standard, its adoption, its promotion, and its importance; (2) the benefits and advantages of the 802.11ac standard; (3) whether certain of the claims of the patents-in-suit read on the 802.11ac standard; (4) the Wi-Fi Alliance's testing protocols for 802.11ac compliance; (5) the Wi-Fi Alliance's certification process for devices as being capable of operation on 802.11ac networks; (6) Apple's status as a Sponsor Member of the organization; (7) Broadcom's status as a Sponsor Member of the organization; (8) whether the Wi-Fi Alliance tests and certifies the Accused Products for compliance; (9) the Wi-Fi Alliance's testing and certification of individual Broadcom wireless chips utilized in Apple devices as being 802.11ac compliant; and (10) all contributions, monetary or otherwise, from Apple and/or Broadcom to the Wi-Fi Alliance.

STC.UNM may also require this Court's subpoena power to obtain documents and testimony from Flex Ltd., which is Apple's contract manufacturer for the Mac Pro in Austin to demonstrate that infringement is literally occurring in this District. That computer is the only Accused Product made in the United States, whereas Apple's other third-party manufacturing partners are all located in China, well outside the scope of compulsory process.

**3. The Convenience to Willing Witnesses.**

As to this factor, a party seeking transfer "must do more than make general allegations that key witnesses are unavailable or are inconveniently located." *ADS Sec. L.P. v. Advanced Detection Sec. Servs., Inc.*, No. A-09-CA-773-LY, 2010 WL 1170976, at *3 (W.D. Tex. Mar. 23, 2010). Instead, the movant must identify specific witnesses and outline the ***substance of their testimony*** so that the Court can determine how important that testimony will be. *Id.*

Apple's entire argument on this point is that the three employees it has unilaterally chosen as "likely Apple witnesses" for this case are located in the NDCAL. But the convenience of ***party***

witnesses is "entitled to little weight" in this analysis. *Freehold Licensing, Inc. v. Aequitatem Capital Partners, LLC*, No. A-18-CV-413-LY, 2018 WL 5539929, at *7 (W.D. Tex. Oct. 29, 2018). And Apple's proffered witnesses have no apparent knowledge of the technology at issue in this case, despite evidence that Apple clearly employs Wi-Fi engineers, who would have such knowledge, right here in this District, and this District is certainly more convenient for them. Apple describes its three chosen employee witnesses with only the most superficial detail, and it does not disclose the anticipated substance of their testimony or how it might be important. None of the employees have described how litigating in this District would be personally inconvenient for them, and the only employee who signed a declaration in support of Apple's motion (Mr. Jaynes) is a career litigation support professional who can hardly claim inconvenience—his job is literally to travel the world in support of Apple's "global litigation" efforts.[17] Finally, neither Apple nor Broadcom's declarant describe why it would be inconvenient for Broadcom's witnesses to travel to this District to testify, should they choose to do so.

This District is far more convenient than the NDCAL for STC.UNM and relevant third-parties. It is only a short 1.5 hour flight from Albuquerque, New Mexico to either Dallas or Austin, and STC.UNM's corporate representative would travel to Dallas (where its counsel is located) for any deposition and/or trial preparation.[18] Ex. 28, 29. Moreover, as discussed previously, the Wi-Fi Alliance is a critical third-party that would likely be unwilling to voluntarily send its representatives to the NDCAL, and it certainly would not do so at the behest of STC.UNM. The presence of that entity in this District, as well as the nearby presence of Apple's contract manufacturer of the Mac Pro, make this District a far more convenient venue (for parties and non-parties alike) than the NDCAL. Apple, as one of the largest employers in this District, cannot credibly claim otherwise.

---

[17] As if to underscore this point, Mr. Jaynes executed his declaration in Barrington, Illinois, not in the NDCAL.

[18] Apple admits that flights from Albuquerque to the NDCAL are at least 2.5 hours. (Dkt. 22 at 12).

**4. Practical Issues.**

To date, STC.UNM has filed one other lawsuit in this Court asserting the same claims of the Patents-in-Suit. *See STC.UNM v. TP-Link Techs. Co.*, No. 6:19cv262 (W.D. Tex. 2019). The pendency of that lawsuit weighs against transfer because "two separate cases in two separate Courts about the same claims in the same patents … would create a disruption in judicial economy."[19] *East Texas Boot Co., LLC v. Nike, Inc.*, No. 2:16-cv-0290-JRG-RSP, 2017 WL 2859065 at *6 (E.D. Tex. Feb. 15, 2017). Apple does not contend that any practical issues mitigate in favor of the NDCAL.

**B. THE PUBLIC INTEREST FACTORS WEIGH STRONGLY AGAINST TRANSFER.**

The first public interest factor is court congestion—i.e., "[t]he speed with which a case can come to trial and be resolved[.]" *In re Genentech, Inc.*, 566 F.3d 1338, 1347 (Fed. Cir. 2009). This factor is far from "neutral" as Apple suggests. As this Court recently recognized, current statistics indicate that the median time for cases to go from filing to trial in the NDCAL is 28.4 months. *Fintiv*, 2019 WL 4743678, at *7. However, the Scheduling Order in this case anticipates that trial will commence on March 3, 2021, which would be less than ***20 months*** after the case was filed. Dkt. 26. This factor ***strongly*** weighs against transfer.

The second public interest factor—local interest in the litigation—also strongly weighs against transfer. Apple claims that the NDCAL has a local interest in this case because the accused technology was developed there, but that is not true. Neither Apple nor Broadcom developed the IEEE 802.11ac wireless standard, but the entity responsible for promoting and certifying compliance with that standard is headquartered ***in this District***. Moreover, Apple manufactures none of the Accused Products in the NDCAL, but its flagship computer (which is an Accused

[19] Moreover, Apple has already sought (and obtained) leave of this Court to serve a subpoena for documents and testimony on ITRI via alternative means, and Apple has accomplished one such form of service. (Dkt. 20, 27). As the date for compliance with the subpoena is not until May 15, 2020, transfer of this case to a different court could cause practical problems if the subpoena is contested.

Product) is made ***in this District***, which automatically "creates" a local interest in this lawsuit. *Tex. Data Co., L.L.C. v. Target Brands, Inc.*, 771 F.Supp.2d 630, 647 (E.D. Tex. 2011). Finally, Apple's second largest corporate office in the world is ***in this District***, and it will soon be the largest employer in the District if it is not already. The Court should not indulge feigned claims of "inconvenience" from a multi-billion dollar company that has a pervasive presence in this District in order to deprive STC.UNM of its choice of litigating in this venue.[20]

### C. APPLE HAS NOT CLEARLY DEMONSTRATED THAT TRANSFER TO AUSTIN IS WARRANTED.

Apple's motion presents no evidence or argument to support transferring this case to the Austin Division even though it purports to seek that relief. Thus, Apple has failed to carry its burden of clearly demonstrating that such a transfer is warranted. In any event, there would be little if any impact on the inconvenience to any witnesses given the short distance between Waco and Austin. *See In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009) (stating that the inconvenience to witnesses begins to increase when the transferor and transferee venues are more than 100 miles apart).

## IV. CONCLUSION

For the foregoing reasons, Apple's Motion to Transfer Venue should be denied.

[20] STC.UNM agrees that the last two factors—familiarity with the governing law and conflicts of law—are neutral.

Dated: November 14, 2019

Respectfully submitted,

By: */s/ William D. Ellerman*

Charles L. Ainsworth (Texas 00783521)
Robert Christopher Bunt (Texas 00787165)
PARKER, BUNT & AINSWORTH, P.C.
1000 East Ferguson, Suite 418
Tyler, TX 75702
Tel: (903) 531-3535
charley@pbatyler.com
rcbunt@pbatyler.com

Michael W. Shore (Texas 18294915)
Alfonso G. Chan (Texas 24012408)
William D. Ellerman (Texas 24007151)
SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300
Dallas, Texas 75202
Tel: (214) 593-9110
Fax: (214) 593-9111
mshore@shorechan.com
achan@shorechan.com
wellerman@shorechan.com

**COUNSEL FOR PLAINTIFF STC.UNM**

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically on November 14, 2019, pursuant to Local Rule CV-5(a) and has been served on all counsel whom have consented to electronic service. Any other counsel of record will be served by first class U.S. mail on this same date.

*/s/ William D. Ellerman*
William D. Ellerman